We're very flattered that you made the trip here. You'll hear two cases today and we'll take a short break after the first one. The first case will be heard as a quorum by Judge Wiener and myself and then we'll break and the second case will be heard by the three-judge panel. Without any more we have the first case is 19-30190 IberiaBank v. Illinois Union Insurance Company. Thank you, Your Honor. May it please the court, Tracy Ray, counsel for the appellant, IberiaBank Corporation. We are here today in an appeal from the district court's order dismissing IberiaBank's complaint for insurance coverage relating to a settlement that IberiaBank entered into with the Department of Justice. Now as set forth in IberiaBank's complaint in this action, the DOJ settlement resolved allegations that IberiaBank had errors in admissions in underwriting mortgage loans for HUD in connection with the FHA's direct endorsement lender program. IberiaBank sought insurance coverage for the DOJ settlement from its insurance carriers who had issued bankers' professional liability policies. And so the key issue that you have to resolve here today is whether taking the record in the light most favorable to IberiaBank, whether IberiaBank has stated a plausible claim for insurance coverage under the language of its insurance policies. And under governing Louisiana law, if IberiaBank offers a reasonable interpretation of that language that leads to coverage, the court has to accept that on the motion to dismiss. And that's because insurance policies are drafted exclusively by the insurance carriers. The policyholder doesn't get any input into the language of those policies. So the courts have recognized that because the purpose is for indemnification. I'm following you, but they may not in the back, so if you could speak a little bit up and maybe slow down just a tiny bit. So if IberiaBank offers a reasonable interpretation of the policy that leads to coverage, the court is required to accept that interpretation on a motion to dismiss. And that is because the Louisiana courts recognize that the purpose of insurance policies is to provide indemnification and that they have to be read broadly and in favor of coverage in light of that purpose and how a reasonable policyholder would interpret the policy. So I'd like to take the court through the language of the insurance policies, IberiaBank's reasonable interpretation of that language, and the record that supports coverage under IberiaBank's reasonable interpretation. So let's start with the language of the policy, and it's quoted verbatim on page 14 of our opening brief. But just to take you through it, under that language, under the insuring language, IberiaBank has to show that it sustained a loss, the DOJ settlement, by reason of a claim brought by a client for wrongful acts in rendering or failing to render professional services. Now, IberiaBank has alleged that HUD is a client because HUD used and relied on IberiaBank's professional loan underwriting services in connection with the FHA direct endorsement lending program. IberiaBank further alleged that the settlement resolved HUD's allegations that underwriting services. And that's all that the insuring agreement requires. Now, normally one would think that the account holders, the customers of the bank paying them to borrow money, are clients. It's sort of attenuated to think that the government that's investigating the bank is at the same time a client of the bank. Right. And I think that it's important to remember that we need to really root the analysis in the language of the policy. And the policy starts off by saying that it will pay for a claim by a third-party client. That word client isn't defined in the policy. When you look at the dictionary definition of client in the Black's Dictionary, which the district court relied on, it says a person or entity that employs a professional for advice to help in that professional's line of business. And then term employ means to use or to make use of or to use as an agent or substitute in transacting business. So HUD set up this direct endorsement lender program to delegate underwriting to the banks. Before the program, it had its own underwriters, and it would look at the credit criteria, compare them, and say- But is it, even if we accept your theory that HUD received professional services, isn't the claimant here DOJ, the Department of Justice? DOJ claimed on behalf of HUD. So, I mean, the claimant was HUD, the DOJ prosecutor. Was HUD a party in this case? I believe HUD was a party to the settlement agreement. Yeah. What's your best case across any field where professional liability extends to cover false claims to the government? Do you have any case? I know the focus we have is to the language. Right. But can you think of a case? Well, certainly. I mean, in the First Horizon case is really the only case that has addressed this issue. The insurers rely on a lot of False Claims Act cases that deal with professional services, but they're very, very different in terms of the government. And they come up in the medical services cases for the most part. And what the courts say is, that's not medical services. Medical services are what you provide to your patient. If you falsely bill the government, that's not a professional service. And we agree with that. But this claim is very, very specific to the underwriting. And this was the DOJ's theory. It's a very creative theory, frankly, under the False Claims Act. And that is that we employed the banks to write these loans. We gave them our underwriting criteria. We asked them to check the borrower's criteria. We asked them to certify that the loans complied. That is the certification. The certification is, this loan, in my professional opinion, complies. And what they said later was, well, we think that there are some problems in your underwriting. Maybe you didn't calculate the debt to income ratio, or maybe the FICO score was off, or something along those lines. That certification is false. That's very, very different. And all of the cases that are cited look at the conduct, not the label of the claim. The lender program, your bank was accepted into the lender program in 2005? Yes, that's right. Does the record contain that? Would you even describe it as a contract? It's all done through regulations, but it's a contractual relationship. And we did plead that that was done through a contractual relationship. And where would I look in the record? The complaint? Because the theory has to be that there is a contract, and the consideration is the underwriting you did, right? No, Your Honor. Our theory is that you don't have to have a contract in consideration with HUD. Because the way the policy is structured, the insuring clause says a third-party client has to bring the claim for wrongful acts in professional services. But it's integrated? Well, but then the policy defines it. Or professional services, and then those are defined. Yes. And I thought that required a contract. Right. The professional services are defined, and they're defined as services performed on behalf of the company for a policyholder or third-party client. And then it says that it has to be pursuant to a written contract with such policyholder or client for consideration inuring to the benefit of the company. So loan underwriting is performed for borrowers as well as HUD. Oh, this is the mix for that second clause, but client meaning a different? It's not that it means different things. Because if you think about it, if a client had to have consideration in a contract, you wouldn't need the second part of professional services at all. It would be subsumed within the definition of client. So the professional services definition just defines what it is that you're insuring. So when you go out and buy a policy, what is it that you're insuring? For a medical malpractice policy, clearly it's your medical services. For a banking policy, it's professional services. And I don't think there's any dispute. I think the district court and the insurers all recognize that loan underwriting is a professional service. It's a service that the bank insures. And you would concede, though, no consideration was given? There's consideration for the underwriting. It's paid through the borrowers. The borrowers, the underwriting is done, and the borrowers pay for that underwriting to the bank. And it's something that they do every day. But no consideration from the government? HUD did not pay for the underwriting. But it doesn't have to pay, because if you think about it, and let's take a medical malpractice claim, for example. It doesn't matter who pays for the professional services. And unless there's something in the policy that says the client has to pay, from a public policy perspective, it shouldn't matter. If a patient, for example, is injured by a doctor in performing medical service, it doesn't matter who paid. It could have been paid by a medical provider. It could have been paid out of pocket by the patient. The important thing is the patient received the professional services, was injured by them, and asserted a claim. And that's a typical medical malpractice claim. Same with this policy. Banks insure the professional services. So what are they insuring? They're insuring underwriting. If a third party uses that underwriting, relies on that underwriting, and says you may have wrongful acts in performing that underwriting, that's a covered claim. That's what the policy is for. It doesn't say borrower. It doesn't define the term client. Remind me in First Horizons how close that case came to saying that the regulating government unit is somehow still a client of the industry being regulated. Yeah. And I didn't mean to mislead the court. First Horizon did not deal with that issue and rule on the issue. So what's your best case for that proposition? That the United States government, in its role as a regulator, ultimately an enforcement entity, is still the client of the private sector entity being regulated, just logically? So again, I don't think that issue's been decided by any court. I don't think anyone has looked at it under this language in this way. So I don't think there's any case on either side of this that looks at it that way. So it's a creative interpretation of client? I think it's a plain meaning interpretation of client. I think that when you look at clients, you need to look at the dictionary definition, and you need to say, what is a client? Do you have to have a contract? Certainly not. Do you have to have... We think the clause that you read, the insuring clause, has to be read in full to mean the client has to be one that has a contract and pays consideration. Do you lose? I think, well, first of all, I think that you have to decide whether or not my interpretation's reasonable. If you think it's unreasonable that no reasonable policyholder could believe that, then I think that we have not stated that it's a client. But I would point out here that, again, the language is not just client, because when you look at the professional services definition, it says a policyholder or client. If it was supposed to be the same person, you wouldn't have that language there. And then the other point is the primary care has drafted policies that say client as a separate definition and says a client has to pay for professional services, and that's in our brief. So that's not here. I don't see a requirement that the claim, the claimant, the third-party client that asserts the claim has to pay for the services. And there's no reason why it should have to be that way. Like I said, from a public policy perspective, it shouldn't matter who pays. Just because your time's a little tight, and I don't mean to interrupt if Judge Wiener has questions, but I had a fact question and two legal questions. The fact question is that both parties refer to the fact that the insurance company was kept abreast of the settlement negotiations. Are those communications and the legal question is they cite the Louisiana case Elliot, and then you may have had time and seen the 28-J letter that came in today. And certainly don't fault you if you don't, but if you've looked at it and had a chance to think about those two cases, would you care to comment on that? Sure. Elliot is a Louisiana case that deals with two lawyers. And the question is, was a fee dispute professional services? And the court said, well, of course not. The one lawyer got the case after the other lawyer. A statute had already elapsed, and there was this fee dispute over who gets paid. That's not professional services. That case, the word client isn't even in it. So it doesn't talk to this issue at all. In fact, it talks about professional services, and some of the other cases say professional services are the type of things you would get paid for. But again, we get paid for underwriting. You get paid by the borrower. We get paid by the borrower. That's absolutely right. You went over that. Did you look at the 28-J? I did. I looked at the 28-J letter. And again, I apologize. No, we encourage you to respond, but I expected you to be this prepared. So right. So XL Specialties is the case that they had cited. It's a Fifth Circuit case. I think it's from 2014. And it deals with, in part, an FCA claim. And it holds that under a CGL policy, completely different type of coverage, that FCA claim is not property damage or bodily injury. Obviously very different than what we're talking about here. Interesting to me in XL Specialty is that it stands for the proposition. It says pretty early on, you look at the facts underlying the liability, not the legal claim. There's no authority for the proposition that FCA claims aren't covered on any type of insurance. In fact, under insurance law, and it's really Hornbook law, you look at the conduct underlying the claim and compare it to the language of the insurance policy. The FCA cases that are cited by the carriers, and there are several, deal with different conduct. They deal with billing the you either didn't do or that you misrepresented. That's not what we're talking about here. And just so that it's clear, the allegation- What's a good FCA case that you may have cited in the brief where it is covered? So Gallup is a case where it's covered. Innovative Mold is another FCA case where they found coverage. And again, it just turns on what are the specific allegations of the FCA claim, not what's the label of the claim. Here, the allegations are that Iberia Bank made errors and omissions in the underwriting process. And so each loan, there needs to be a certificate that says this one complies with your guidelines. And what happens is after that happens, it's automatically insured. The loan may perform. You may never have to pay on the insurance, or the loan may default. And at the back end, the payment's automatic. There's no false statement on the back end. The false statement's on the front end. And the question is, if you have errors and omissions in your underwriting process, for someone who relies on that process and uses you as a substitute for that process, is that a covered claim? And we submit that it is. That's exactly what the policy covers. It covers any sort of wrongful acts in professional services. It covers errors, omissions in underwriting loans. And here we were doing that for HUD, and here HUD made the claim, and that's a covered claim. Okay, Counsel. You can add that time to rebuttal time if you want, but— Yes, actually, I will, if that's okay. Thank you, Your Honor. Let's see. We have two counsels. Shared time. Mr. Sterling. May it please the Court. Scott Sterling for Illinois Union Insurance Company. Your Honor, I'd like to start with your question as to Elliott, because I think this case comes down to a pretty straightforward contract interpretation exercise. In Elliott, it was much like this case. It was a mix-and-match theory, as you say. A lawyer was sued by another lawyer who he had referred a case to, but he had already allowed that case to prescribe by not filing it on time. The theory there was that the suit was covered under a professional services or professional services, and failing to file the claim on time was delivered to the client, but the person bringing the claim, the other lawyer, was not involved in the professional services. That type of argument is the same argument that Iberia Bank is making here, and it doesn't comport with Louisiana law as to the interpretation of insurance contracts. One of the big principles of law here that we have to remember is that under Louisiana Civil Code 2050, you have to read the entire policy holistically as a whole together, and you can't separate its independent parts. At its core, that's what Iberia Bank is trying to do. They're trying to take the client in the insuring clause and meet it one way, then take the later professional services, which is also in the insuring clause, meet it another way, and do away with the wrongful act requirement, which is also in the insuring clause. They're a mix-and-match argument here. Why did the insuring clause distinguish between clients and policyholders? A policyholder, I think, in the professional services definition, that just submits that a policyholder is a client. Sometimes a bank issues insurance policies, disability policies, life insurance policies that are wealth transfer and show that if a claim is brought by someone, a policyholder, this is that type of insurance as well. It doesn't mean the client bringing the suit can be a different person than the policyholder, and I think to read it that way would not be compatible with Louisiana law. But the government, you know, it is delegating this underwriting services, so they're looking to the banks to do some work for them, and the argument is that there's a reasonable ambiguity to that, right? So first, I don't agree that Iberia Bank is doing work for the government. So what Iberia Bank was doing, they were underwriting the loans for Iberia Bank. The bank was the mortgagee. Iberia Bank was able to obtain government mortgage insurance from the government by meeting the government's specific rules and regulations that allow it to speed up the process. The district court said interacted with and partnered with. Would you accept that characterization? I would say that Iberia Bank had to follow the law to get the mortgage insurance. The benefit here is to Iberia Bank. It's not necessarily the government. The government is just able to execute the laws that Congress passed by providing mortgage insurance to people who they want, and what happened here is the... I thought the lending program was a regime where the government is saving an immense amount of effort. It doesn't have to do any of this. It's saying, you banks, do it for us, and in exchange, you get consideration. No, I think what it is is the government is able to insure loans, right? But the bank is the one that's getting the benefit because it's their loans that are being insured, and what happened here was Iberia Bank was providing false verifications that these loans were actually eligible for insurance when they were in fact not, and therefore, the government was having to pay out insurance claims on mortgages that it shouldn't have had to. So the government, in this False Claims Act action, in the Ketam complaint and in the settlement, came at Iberia Bank to find that they could get that money back, or more likely for civil penalties. If you look at the actual settlement agreement, it cites the False Claims Act. It cites the civil penalties section. They're exercising their enforcement authority and their authority under the False Claims Act, and in that regard, there's a slew of federal circuit court cases that say when you're looking at how to determine whether a False Claims Act claim is covered, the relevant inquiry to look at is what is the conduct upon which liability can be based, and that is the submission of false claims, verifications, and certifications to the government. It is not the conduct underlying the false claims. So here, it's not underwriting because that was Iberia Bank's business. In the Medicare cases, it's not staffing and professional care standards of care because that's their business. The relevant inquiry is regarding the false claims submitted to the government, and here, that type of liability cannot trigger the insuring clause because there's no client, there's no professional services, and the False Claims Act claim is not for a wrongful act in delivering professional services, and there are several. Do you win only if we look at the clause, as you said, holistically, that arguably the government could be a client, but it's not a client with a contract paying consideration, or would you say that the district court independently held that under the ordinary meaning of client, it's not a client regardless of whether there's a contract in consideration? I think there's both, Your Honor. First, even if you look at the word client at the very beginning of the insuring clause, even if the government could be considered a client, you still have to look at the claim and the nature of the claim, and if it meets the insuring clause, you still have to have a wrongful act in the rendering or failing to render professional services under a contract for consideration, inuring to the benefit of Iberia Bank. The fact that they say they could get the consideration from the borrower is ... That's when you say, that's when you rely on Elliott. That's where I rely on Elliott, and also, there are no allegations on behalf of any borrower. There are no allegations that Iberia Bank did anything wrong, any wrongful act to any borrower. The only allegations were they were submitting false certifications to the government. They didn't hurt any borrower here, and there's no claim thereof, so to say that the professional services definition is met from their relationship with the borrower is ignoring the entire nature of this professional liability policy, a malpractice policy. Another thing I would like to address is that Iberia Bank argues that dismissal on Rule 12b-6 was improper. The thing is, Iberia Bank says they should be able to take discovery and develop the facts.  The proper inquiry, and the only thing you can look at to determine whether there's coverage or not, is the policy, the underlying complaint, and there's a settlement here. They say the settlement agreement's the claim. If you want to look at that, you can as well. Under all of this, it's clear that the conduct alleged, the false claims to the government, don't meet the insuring clauses requirements. You mentioned just in oral argument two cases where false claims act conduct was covered. Yes. Do you know those cases off the top of your head? Yes, I do. So the Gallup case was a case out of the district of Massachusetts, and that case is difficult to analyze because much of it is redacted, I assume because the government still had a false claims act or some other investigation, and they mandated the opinion be redacted. So the underlying facts there are not available. But still, that was not the type of policy we have here. It was dealing with a, I'm sorry, I'm talking about the Innovative Mold case, which was the one that was redacted out of the district of Massachusetts. But it was dealing with broad occurrence definition and a CGL policy. But I would submit that that case goes against the general principle that's cited by all these circuit court opinions, including the case in our 28J letter, that you have to look at the actions that liability can be held for under the False Claims Act, not the underlying conduct. So I do think there was a mistake with that case. But with Gallup, which was a Delaware trial court, state court case, that case was interesting because the court actually ruled that the conduct, the professional services, or the False Claims Act claim was not professional services in the context of a professional services exclusion. So that was a totally different policy. But on the more specific issue, it actually supports the insurer's case here. But those two cases are grasping very difficultly to have anything. And in the First Horizon case, that case didn't at all deal with the issues here. There was a one-sentence statement by the district court when he was dealing with a different issue that says this appears to be the type of claim that's covered under the professional liability policy. That's all there is. That issue was never briefed or decided before the court. And that case was ultimately decided on summary judgment regarding notice issues. You have impressed in your brief or an argument the point I raised, which is that DOJ is the claimant, not HUD. That hasn't been a point that you've pressed at all. We haven't raised that because in the QITAM complaint, the relators sue on behalf of HUD. And I do think HUD's a party to the settlement agreement. But the point we do raise is that the borrower is not a party to the agreement. And they didn't sue Iberia Bank. The borrower is the one they say is the client. And I thank Your Honor. Mr. Judge? Good afternoon, Your Honors. May it please the court, I'm Thomas Judge, counsel for defendant Apelli, Travelers Casualty Insurance Company of America. Travelers is an excess carrier above Illinois Union. And as a starting matter, Travelers joins in the arguments made by Illinois Union seeking affirmance of the district court's well-reasoned and well-supported decision. And I'm not going to say much more about that other than just very quickly that the documents, the underlying documents on the record, the settlement agreement, the False Claims Act complaint speak for themselves. And the bank's characterization of those documents is entitled to no deference. And if you look, for example, at the settlement agreement, and this is at record 200, one of the first recitals in the agreement talks about the fact that what happened here is HUD program creates the False Acts Claim claim is that HUD provided mortgage insurance to the bank. It's providing a benefit to the bank. The bank is issuing loans as part of its business to the borrowers. The bank wants a benefit from the government that it can obtain through regulations and a program. And it obtained those benefits, much like medical providers who seek reimbursement from Medicare. In the Horizon West case from the Ninth Circuit, the medical provider certified that the quality of services complied with regulations entitling it to reimbursement and sought reimbursement. It then was subject to False Acts Claims claims. The court said, that's not professional services rendered to the government. You rendered professional services to the patient. You made certifications about the quality of those services to the government to obtain a benefit from the government, Medicare reimbursement. And this is an analogous situation. The government makes available mortgage insurance to bankers on loans they underwrite that comply with the regulations. And the counsel for the bank has talked about the government assigned or retained the bank to perform underwriting services. That's not true. The government doesn't retain banks and say, hey, please come work for us and go underwrite loans for us. The banks have a commercial enterprise. They underwrite loans. The government has a program that enables the bank then to submit requests for coverage. And if the loan defaults and the borrowers can't pay, the bank can then obtain payment on the loan from the government. And if you look at the settlement agreement, the False Claim Act Complaint, it lays that out. Yes, underwriting was done. And the allegation is that the underwriting did not match up with the certifications and claims that were made for benefits to the government. So simply put as it can, setting aside whether this is a client or not, the government in this context was not the bank's client. The bank sought and obtained insurance from the government. The government provided the benefit to the bank. And the, well, I'll just leave it at that. That's your support of their argument. Did you want to bring up anything else? Yes, one separate issue I wanted to bring up, which the district court did not reach. And this court does not have to reach either if it affirms the district court's opinion or ruling. But if the court does not do that, we request and respectfully request that the court consider the issue raised before the district court that was not reached, which is under the traveler's excess policy, traveler's liability under the policy, the liability to provide coverage does not occur until the underlying insurance is exhausted by payment by the underlying insurer. Iberia Bank, in response, has cited a case where a court said, oh, that's not necessary. But in that case, the language is much different. Only the loss had to exceed the underlying limit. In that case, Fremont did not require that the underlying carrier actually paid its limits. We have cited other cases, including Citigroup from this court, where the court enforced the very language at issue here, applying language from a St. Paul policy, which is a traveler's company. The language is identical. And the court enforced the language as written. There has to be payment by the actual underlying insurer before there can be coverage under the excess policy. That just has not happened here. And until that happens, travelers cannot be in breach. Its liability and its determination, you know, if and when Illinois Union pays its limit and Iberia Bank comes to travelers and says, Illinois Union has paid its limit, what are you going to do, travelers? Then we could have maybe a ripe dispute if travelers says, no, we're not going to provide coverage. But that's not what we have here. The facts are undisputed. And alleged by Iberia Bank, the Illinois Union has not paid its limit. Travelers, therefore, should not be in court right now. And the claims against travelers should be dismissed at a minimum without prejudice on this exhaustion issue. And again, if the court affirms the district court's ruling, the court does not have to reach this issue at all. And if it affirms the district court's ruling, the claim should be dismissed with prejudice. Thank you. Final argument. Your Honor, if I could address first the travelers argument just briefly. Travelers policy in its insurance clause says it's going to provide the same coverage as the CHUB policy. So it's saying we're going to give you the same thing, just, you know, an extra layer of coverage. The liability here, the settlement, goes through CHUB and up to travelers. So there's no doubt there's a fixed liability that goes above the attachment point. They say, even though they're going to give us the same coverage, and even though they've said we don't get coverage for the same reasons, they can't get sued. And there's just no case that holds that. There's no case that says when you have a fixed limit and they've denied coverage that the carrier shouldn't be in court. And it doesn't make any sense because everybody needs to be here to determine the actual case in controversy, and that is whether there's coverage under the policy or not. So that's just on travelers. Do you have a quick thought on Citigroup? Citigroup, I believe, and I'd have to double check, but all of the cases that they cite, my understanding is that those were cases, it's a Qualicom issue, we call it in the insurance world. It's an exciting thing. So if you settle with a primary carrier for less than your limits, you're never going to get to the excess. So in those situations, when the excess says, we will only pay if the primary pays the whole amount, you're never going to get to the excess, and the excess can go free. Here, though, we don't have a settlement with Chubb. We have a dispute, obviously, and the court will decide whether or not there's coverage, but their policy says that they're not liable to pay until there's payment made, but doesn't say that you can't contest coverage or that there's not a case in controversy until that happens. That's just a function of timing, not, you know, is there a legal obligation. So that's the traveler's argument. With respect to the other arguments, I think that both counsel made very similar points, and I think that sitting at counsel table sounds a lot more like a summary judgment argument than a motion to dismiss. The question of what happens in the DE lender program has to be taken in our favor. The allegations that we make and that the settlement, that are in the settlement agreement in the Kitam case have to be drawn in favor of Iberia Bank, and it doesn't seem like the carriers want to do that. They say, for example, well, the borrower didn't sue you. Well, the policy's not limited to borrower coverage. It doesn't say a borrower has to sue you. It says a client, and for the reasons we discussed, we believe it fits the plain meaning. They also say that there's no, that what's going on here really isn't underwriting errors and admissions. That's the allegation. That has to be credited as true. And in fact, the settlement agreement gives concrete examples on a loan-by-loan basis of the errors and admissions that occurred. It talks about not having documentation for a particular borrower, not rectifying applications, the discrepancies in the applications. That's the underwriting. That's you didn't do something right in underwriting. That's exactly what professional services coverage covers. And then the other point that I think is hammered really through the briefs, but also here in oral argument today, is this benefit argument. That's not the test. And I see my, I'm out of time, but the test is what is the language of the policy? Benefit doesn't matter. Thank you. We will take a very quick break. So students, you can stay right there. We're just going to step out and come back in about three minutes.